# Illinois Official Reports

## Appellate Court

---

**Village of West Dundee v. First United Methodist Church of West Dundee,**
**2017 IL App (2d) 150278**

---

| | |
|---|---|
| Appellate Court Caption | THE VILLAGE OF WEST DUNDEE, Plaintiff and Counterdefendant-Appellee, v. FIRST UNITED METHODIST CHURCH OF WEST DUNDEE, Defendant and Counterplaintiff-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-0278 |
| Filed | March 7, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 12-MR-573; the Hon. James R. Murphy, Judge, presiding. |
| Judgment | Judgment vacated; order reversed; cause remanded. |
| Counsel on Appeal | Thomas E. Sullivan, of St. Charles, for appellant.<br><br>John E. Regan and Jennifer Sellers Wong, of Early, Tousey, Regan, Wlodek & Wong, of Elgin, for appellee. |
| Panel | JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.<br>Justices Burke and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1    In this case, the trial court dismissed the amended countercomplaint filed by defendant, the First United Methodist Church of West Dundee (Church), and held a trial on the initial complaint filed by plaintiff, the Village of West Dundee (Village). Ultimately, the trial court found for the Village. Because the amended countercomplaint should not have been dismissed, the judgment must be vacated.

¶ 2    This case concerns the fate of a building located at 310 West Main Street (310 building) in the Village. Constructed in 1849, the 310 building is one of the Village's oldest historic structures. The Church, which owns some of the adjacent structures on Main Street, acquired the 310 building in the 1950s and began using it as a parsonage—a residence for the pastor and his or her family. The record shows that the 310 building is one of the 65 buildings in the surrounding area comprising the Dundee Township Historic District (Historic District), most of which were added to the National Register of Historic Places in 1975. (A National Register listing places no obligations on private property owners nor does it "restrict[ ] *** the use, treatment, transfer, or disposition of private property." See *National Register of Historic Places Program: Fundamentals*, Nat'l Park Serv., https://www.nps.gov/nr/national_register_fundamentals.htm (last visited Mar. 6, 2017).)

¶ 3    The Church made some efforts to repair and maintain the building over the years, but by 2004 the building's age and deteriorating condition made it uninhabitable, and the pastor and his family had to be relocated. Since 2004, the 310 building has sat unused and unrepaired, accelerating its decline. In 2007, the Church applied to the Village's appearance review commission for a permit to demolish the building. In its application, the Church stated that its congregation includes approximately 100 families and that it had insufficient parking spaces and handicapped spaces for its congregation. Accordingly, the Church averred that its needs would be better served if the 310 building were demolished and turned into additional parking. See generally *Our Saviour's Evangelical Lutheran Church of Naperville v. City of Naperville*, 186 Ill. App. 3d 988, 994 (1989) (noting that "the parking needs of a church should [not] be considered on different legal principles than those applied to the church building itself"). In June 2008, however, the appearance review commission formally denied the Church's request, citing a desire to see the building repurposed and restored, or at the very least "mothballed"—that is, repaired to good condition for its continued preservation. The Church did not appeal the commission's decision to the Village's board of trustees, which it was entitled to do. See West Dundee Municipal Code § 2-2-6 (added Feb. 18, 2008).

¶ 4    In July 2012, following an inspection of the building by a Village code enforcement officer, the Village issued the Church an order of correction citing 14 property maintenance violations. Some of the violations listed in the correction order were significant, and per the order, the Church was given 45 days to repair or replace the building's roof, soffits, fascia, support posts, windows, siding, flooring, gutters, and downspouts, as well as the building's porch and interior and exterior brickwork. When the Church failed to comply with the correction order, the Village filed a complaint in the circuit court under section 11-31-1(a) of the Illinois Municipal Code (Municipal Code) (65 ILCS 5/11-31-1(a) (West 2012)).

¶ 5    Section 11-31-1(a) of the Municipal Code provides that, when a building falls into disrepair and becomes dangerous or unsafe, municipal authorities may seek a court order to require the building's owner or owners to "demolish, repair, or enclose the building." *Id.* Any

cost incurred by the municipality in pursuit of the building's demolition or repair is recoverable as a lien on the property. *Id.* In this case, the Village's complaint exclusively sought the building's repair, not its demolition. To that end, the Village asked the court to place the 310 building in receivership and to place a lien on the Church for the costs of the building's repair.

¶ 6    The Church filed a countercomplaint asserting that it would cost $300,000 in exterior work alone to mothball the outside of the 310 building and over $700,000 to repair it. These sums, the Church stated, "would be financially devastating and likely cause the [Church's] financial demise." Moreover, they would be substantially more than the building was estimated to be worth. (Elsewhere, the record indicates that the building's value "as is" was less than $100,000.) In its countercomplaint, the Church also noted its need for parking as integral to its congregation's freedom to worship. See generally *Our Saviour*, 186 Ill. App. 3d at 994.

¶ 7    Accordingly, the Church claimed that the Village's refusal to authorize demolition of the 310 building imposed a substantial burden on the Church in violation of section 2000cc(a)(1) of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) (42 U.S.C. § 2000cc(a)(1) (2012)). That section forbids a government agency to "impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly or institution—(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." *Id.* Since, according to the Church, RLUIPA forbade the financially ruinous repair of the 310 building, the Church sought a court order authorizing the building's demolition as an alternative remedy for its condition under section 11-31-1(a) of the Municipal Code.

¶ 8    The Village filed a combined motion to dismiss the Church's countercomplaint. According to the Village, because the Church had not alleged "that the Village ha[d] denied a request to expand their parking on existing vacant Church[-]owned land," the Church's countercomplaint failed to state a claim (see 735 ILCS 5/2-615 (West 2012)). In addition, the Village asserted that, as an affirmative matter (see 735 ILCS 5/2-619(a)(9) (West 2012)), the Church was estopped from seeking demolition of the 310 building because the Church had not exhausted its administrative remedies by appealing the 2008 denial of its request for a demolition permit. The Church countered that, under cases such as *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106 (2004), the Church, as the building's owner, was entitled to choose *either* the building's demolition *or* its repair in response to official action per section 11-31-1(a) of the Municipal Code. See *id.* at 127 (noting that "section 11-31-1[(a)] provides for repair or demolition *in the alternative* and, thus, 'contemplates repair where feasible and demolition where the state of deterioration is such that repairs would amount to a substantial reconstruction' " (emphasis added) (quoting *City of Aurora v. Meyer*, 38 Ill. 2d 131, 136 (1967))). The Village responded by distinguishing *Stokovich* on the ground that there, as in virtually every similar case, local officials had sought demolition without providing the owner with an opportunity to repair the structure, but here, the Village argued, it was seeking the remedy of repair *exclusively* so the concerns of *Stokovich* and cases like it did not apply. After a hearing, the trial court granted the Village's section 2-615 motion to dismiss and denied the Village's section 2-619(a)(9) motion.

¶ 9    Thereafter, the Church filed a three-count amended countercomplaint. In this version of the countercomplaint, the Church revised its estimates for work on the 310 building, stating that it

would cost $250,000 to mothball the exterior and $600,000 to repair the entire building. The first count in the amended countercomplaint restated the Church's RLUIPA claim, but this time added an allegation—that the Village had approved the demolition of three other specific structures in the Historic District for commercial uses. The remaining two counts sounded in inverse condemnation, alleging that the Village's refusal to issue a demolition permit constituted a "taking" of the building, for which the Church sought either just compensation or to compel the Village to institute eminent domain proceedings under a writ of *mandamus*. The Village filed a combined motion to dismiss the amended countercomplaint on substantially the same grounds as its earlier motion per sections 2-615 and 2-619(a)(9). After commenting at length on the Church's "failure" to exhaust administrative remedies, the trial court issued the conclusory pronouncement that the amended countercomplaint failed to state any claim and granted the Village's motion to dismiss the countercomplaint with prejudice.

¶ 10    As the trial date neared on the Village's complaint, the Village filed a motion *in limine* to bar the Church from presenting any evidence regarding the value of the 310 building and its projected "repair" costs. The Church objected, but the trial court granted the Village's motion. The Church next sought leave to tender affirmative defenses related to the cost of the repairs and the alternative remedy of demolition, but the trial court denied the Church leave to do so.

¶ 11    The evidence at trial revealed that the 310 building was a wreck. Age, mold, and rot had clearly overtaken the almost-170-year-old building. A Village code officer testified concerning the property code violations. An architect with experience in the preservation of historic structures testified that the building's foundation, exterior and interior walls, and columns would all require various types of shoring and replacement. At numerous times throughout the hearing, the Church attempted to make offers of proof concerning the value of the 310 building, the cost of repairs, and the viability of the alternative of demolition, but for the most part the trial court would not accept the Church's offers of proof.

¶ 12    After the trial, the court determined that the 310 building was dangerous and unsafe. The court ordered that, if the Church did not repair the building within 14 days, the Village was authorized to undertake the repairs and to place a lien on the Church for the repair costs. The Church's posttrial motion was denied and the Church appealed.

¶ 13    Before this court, the Church contends that its amended countercomplaint should not have been dismissed. According to the Church, its amended countercomplaint did state a cause of action (three, in fact) and should not have been dismissed on section 2-615 grounds. Furthermore, the Church contends that it was not estopped from seeking a court order for the 310 building's demolition in response to the Village's complaint seeking a court order for its repair, and so the Church's amended countercomplaint should not have been dismissed on section 2-619(a)(9) grounds. We review both issues *de novo* (*Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31), and having done so, we agree with the Church.

¶ 14    We note that much of the parties' arguments centers on the applicability of *Stokovich* and *City of Aurora*. For the time being, we need say only that we find unpersuasive the Village's attempt to cabin those cases solely to the local authorities' demolition petitions. We determine that *Stokovich* and *City of Aurora* stand for the *general* proposition that, when municipal authorities seek one form of relief under section 11-31-1(a) of the Municipal Code, the building's owner is entitled to file a counterclaim seeking an alternative form of relief. See *Stokovich*, 211 Ill. 2d at 127; *City of Aurora*, 38 Ill. 2d at 136. With this understanding in mind, we turn to the dismissal of the Church's amended countercomplaint.

¶ 15　　　We can quickly dispense with the ground on which the trial court dismissed the amended countercomplaint pursuant to section 2-619(a)(9)—that the Church failed to exhaust its administrative remedies after the Village denied the Church's request for a demolition permit in 2008. In general, a party's failure to exhaust administrative remedies is a straightforward basis for disposing of that party's complaint by way of a section 2-619(a)(9) motion to dismiss. See, *e.g.*, *City of Chicago v. Piotrowski*, 215 Ill. App. 3d 829, 834 (1991). Thus, the exhaustion requirement would ordinarily prevent the Church from bringing the Village into court while the Church sought an order forcing the Village to authorize the building's demolition. But here, it was *the Village* that brought the Church into court over the fate of the building. It is well settled that the exhaustion requirement does not apply when, as here, the court proceedings are instituted by the local authorities. See *Moore v. City of East Cleveland*, 431 U.S. 494, 512 (1977); *Casualty Insurance Co. v. Hill Mechanical Group*, 323 Ill. App. 3d 1028, 1037 (2001); *County of Cook v. World Wide News Agency*, 98 Ill. App. 3d 1094, 1097 (1981); *City of Des Plaines v. La Salle National Bank of Chicago*, 44 Ill. App. 3d 815, 819 (1976); see also *County of Lake v. MacNeal*, 24 Ill. 2d 253, 260 (1962) ("[t]o compel a property owner to first seek local relief *** would be a patently useless step" when "local authorities institute an action"). Thus, the Church is correct that, due to the parties' procedural relationship, the exhaustion requirement did not apply in this case. Accordingly, the trial court erred to the extent that it dismissed the Church's countercomplaint pursuant to section 2-619(a)(9).

¶ 16　　　We turn then to the dismissal of the Church's amended countercomplaint for failure to state a claim under section 2-615. All that is required to survive a motion to dismiss for failure to state a claim is that the plaintiff allege facts that, taken as true, are sufficient to bring a claim within a recognized cause of action. *Kanerva v. Weems*, 2014 IL 115811, ¶ 33. In other words, a complaint should not be dismissed on section 2-615 grounds unless no set of facts would warrant relief. *Borcia v. Hatyina*, 2015 IL App (2d) 140559, ¶ 20. Such is not the case with any of the claims in the Church's amended countercomplaint.

¶ 17　　　In count I of the amended countercomplaint, the Church alleged that, notwithstanding the Village's efforts to force the Church to repair the building, the Village's continued denial of a demolition permit constituted a "substantial burden" on the Church's free exercise of its religion in violation of section 2000cc(a)(1) of RLUIPA (42 U.S.C. § 2000cc(a)(1) (2012)). Specifically, the Church alleged that the significant cost to repair the building would potentially ruin the Church. By any reasonable measure, the burden imposed on the Church, taking the Church's statement of it as true at this point, would certainly qualify as "substantial." See *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 96 (1st Cir. 2013) (holding that "[a] burden does not need to be disabling to be substantial" under RLUIPA); see also *World Outreach Conference Center v. City of Chicago*, 591 F.3d 531, 538 (7th Cir. 2009) (reversing dismissal of religious sect's substantial-burden claim). Therefore, we determine that the Church stated a *prima facie* substantial-burden claim under section 2000cc(a)(1) of RLUIPA and that the claim should not have been dismissed.

¶ 18　　　In so holding, we must comment on some of the assertions in the Village's appellate brief. First, the Village asserts that its property maintenance code—which is merely an adoption of the 2012 International Property Maintenance Code with minor amendments (see West Dundee Municipal Code § 9-1F-1 *et seq.* (added Aug. 8, 2014))—"is not [a] 'land use regulation' falling within the purview of RLUIPA." On a related note, the Village argues that RLUIPA

simply does not apply to the 310 building because the building is presently "vacant," "uninhabitable," and "not used for the purpose of religious exercise." Thus, the Village appears to assert that RLUIPA has nothing to say about intended uses for real property, but protects only present uses. The Village is wrong on both points.

¶ 19    RLUIPA protects "[t]he use, building, *or conversion* of real property for the purpose of religious exercise" (emphasis added) (42 U.S.C. § 2000cc-5(7)(B) (2012)), which includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" (42 U.S.C. § 2000cc-5(7)(A) (2012)) from government enforcement of a land use regulation. RLUIPA defines a land use regulation as any "zoning or landmarking law, or *the application of such a law*, that limits or restricts a claimant's use or development of land (including a structure affixed to land)." (Emphasis added.) 42 U.S.C. § 2000cc-5(5) (2012). The foregoing language undoubtedly covers the Church, the 310 building, *and* the Village's complained-of actions. Here, the Church, a religious claimant, is asserting that its property interest in the 310 building has been "limit[ed] or restrict[ed]" by the Village's refusal to permit the 310 building's demolition. That claim is sufficient to trigger RLUIPA. It is true, as the Village notes, that a religious organization's purely commercial endeavors—such as the sale of its property to a private developer for an entirely secular use like the construction of market-rate condominiums—are likely to fall outside of RLUIPA's protections (see, *e.g.*, *California-Nevada Annual Conference of the Methodist Church v. City & County of San Francisco*, 74 F. Supp. 3d 1144, 1154 (N.D. Cal. 2014)), but that is not the case here. The Church has repeatedly stated that it intends to use the land under the 310 building as a parking lot for its congregation. Given the ubiquity of cars and other motor vehicles, sufficient parking is, as this court held years ago in *Our Saviour*, every bit as fundamental as a sanctuary is to its church or an ark is to its synagogue. See generally *Our Saviour*, 186 Ill. App. 3d at 994. In short, the Church owns the 310 building; it wants to use the building and the land for a particular purpose, but the Village is (allegedly) standing in the Church's way. Congress mandated that RLUIPA be construed "in favor of a broad protection of religious exercise" (42 U.S.C. § 2000cc-3(g) (2012)), and in our view, this case (which again is only at the pleading stage) presents the precise sort of situation that RLUIPA was designed to cover.

¶ 20    We note, too, that there was some confusion as to the allocation of the parties' responsibilities on a substantial-burden claim under RLUIPA. In the trial court, it was suggested by the Village and the court that the Church had some obligation to successfully plead its way around the Village's potential least-restrictive-means and compelling-interest arguments. That suggestion holds the Church to a higher burden than RLUIPA requires. Under RLUIPA, the initial burden is on the plaintiff to show that he has a sincere religious belief and that his religious exercise was substantially burdened. 42 U.S.C. § 2000cc(a)(1) (2012). If the court determines that the plaintiff has made that required showing, then the burden of persuasion shifts to "the government"—in this case, the Village—to demonstrate that its actions further "a compelling governmental interest" by "the least restrictive means." *Id.*; see, *e.g.*, *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 290 (5th Cir. 2012); *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1171 (9th Cir. 2011); *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 353 (2d Cir. 2007); see also *Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005) (applying the same pleading requirements under RLUIPA's parallel substantial-burden provision that applies to prisoners and other institutionalized persons). We have already determined that the Church made the necessary

allegations at the pleading stage to substantiate its substantial-burden claim and to survive a section 2-615 motion to dismiss. See *Borcia*, 2015 IL App (2d) 140559, ¶ 20. At this point in the litigation, the Church was not required to do anything more under section 2000cc(a)(1) of RLUIPA.

¶ 21    In addition to the substantial-burden claim, we note that count I of the Church's amended countercomplaint stated a *second* claim under RLUIPA. Although that claim was not separately labeled (the Church unhelpfully set out its allegations regarding the facts, jurisdiction, and the parties under a single label, "COUNT I," and cited the entirety of RLUIPA), courts must rely on a pleading's substance, not its labels. See *In re Marriage of Kuyk*, 2015 IL App (2d) 140733, ¶ 9. Again, count I of the amended countercomplaint also alleged that the Village had approved demolition permits for at least three other structures in the Historic District for commercial uses. For example, the Church alleged that one demolition permit went to a dentist who was given leave to demolish a historic building to create parking space for his dental practice in a neighboring historic building. That allegation set forth a distinct cause of action under section 2000cc(b)(1) of RLUIPA (42 U.S.C. § 2000cc(b)(1) (2012)), which provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." An unequal-treatment claim under section 2000cc(b)(1) may be litigated solely on the basis of an allegation of unequal treatment. No other allegation, such as whether the challenged conduct also constitutes a substantial burden, is required. On its face, the Church's amended countercomplaint painted a picture of arbitrary enforcement: the Village granted three commercial land users leave to demolish historic buildings while the Church, a religious institution, was denied the same privilege. That allegation was sufficient to state a claim of unequal treatment under section 2000cc(b)(1) (see *Opulent Life Church*, 697 F.3d at 291; *Centro Familiar*, 651 F.3d at 1173; *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1229-35 (11th Cir. 2004); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762 (7th Cir. 2003)) and, likewise, should not have been dismissed.

¶ 22    The same holds true for the inverse condemnation claims in counts II and III of the Church's amended countercomplaint. Both counts alleged that the Village's actions—either by instituting the repair proceedings or by denying the Church a demolition permit, or both—had accomplished a "taking" by denying the Church the use of the 310 building, even if only temporarily so. That is all that is required to state an inverse condemnation claim against a public entity—an allegation that the owner was temporarily deprived of the use of the subject property without the formal exercise of eminent domain proceedings (*Westwood Forum, Inc. v. City of Springfield*, 261 Ill. App. 3d 911, 923 (1994); *Tim Thompson, Inc. v. Village of Hinsdale*, 247 Ill. App. 3d 863, 886 (1993); *Chef's No. 4, Inc. v. City of Chicago*, 117 Ill. App. 3d 410, 413 (1983))—since a taking can be accomplished as much by the government's physical act as by regulatory force. See *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 312-13 (1987); *Hampton v. Metropolitan Water Reclamation District*, 2016 IL 119861, ¶ 22; see also *Ali v. City of Los Angeles*, 91 Cal. Rptr. 2d 458, 464 (Ct. App. 1999) (holding that the denial of a demolition permit for a historic structure could constitute a taking). Accordingly, the trial court erred when it dismissed counts II and III of the amended countercomplaint.

¶ 23 The Church further asserts that the trial court erred when it denied the Church leave to file its counterclaims as affirmative defenses and when it barred the Church from presenting evidence concerning the 310 building's value and the cost of repairing it versus demolishing it. However, because we have determined that the trial court should not have dismissed the Church's amended countercomplaint, it is unnecessary to address those issues.

¶ 24 Before concluding, we will put a finer point on what we said earlier (see *supra* ¶ 14) regarding section 11-31-1(a) of the Municipal Code, *Stokovich*, and *City of Aurora*. Again, as our supreme court said in *Stokovich*: in "provid[ing] for repair or demolition *in the alternative*[, section 11-31-1(a) of the Municipal Code] 'contemplates repair where *feasible* and demolition where the state of deterioration is such that repairs would amount to a *substantial reconstruction* [of the building].' " (Emphases added.) *Stokovich*, 211 Ill. 2d at 127 (quoting *City of Aurora*, 38 Ill. 2d at 136). The statute operates on a continuum that is as wide and as varied as a building's condition, defects, value, and impact on the surrounding community. After all:

> "There are many kinds of deficiencies which would render a building dangerous and unsafe, but which can readily be obviated by appropriate repairs. Inadequate wiring, or a weakened supporting beam \*\*\*, even if serious enough to sustain a finding that the structure is dangerous and unsafe, would not in many cases warrant complete destruction. The cost of repairs may well be a small fraction of the building's value. The court should find from the evidence what the specific defects are which render the building dangerous and unsafe. If they are such as may readily be remedied by repair, demolition should not be ordered without giving the owners a reasonable opportunity to make the repairs." *City of Aurora*, 38 Ill. 2d at 137.

Conversely, if the building cannot be readily repaired, or if repair makes "so little economic sense that it is unlikely that an owner would make use of any further opportunity to repair" (*Stokovich*, 211 Ill. 2d at 131), then demolition may be the appropriate course. As those cases and the statute's plain language indicate, the purpose of section 11-31-1(a) of the Municipal Code is to put unsafe buildings into safe condition with as minimal disruption to the owners' property rights as is reasonably possible. Sometimes demolition and not repair will result in the least disruption; sometimes not. Whether this case is the former or the latter is a matter for the trial court to determine on remand.

¶ 25 The Church's amended countercomplaint sufficiently stated several claims and was not barred on failure-to-exhaust grounds; therefore, the amended countercomplaint should not have been dismissed. Accordingly, the judgment of the circuit court of Kane County is vacated; the order that dismissed the Church's amended countercomplaint is reversed; and the cause is remanded to the trial court for further proceedings consistent with this opinion.

¶ 26 Judgment vacated; order reversed; cause remanded.